## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**MELISSA BOSCH**                                                                                  **PLAINTIFF**

**v.**                                   **Case No.: 4:22-cv-00677-LPR**

**TONY THURMAN, as Superintendent of Cabot**
**Public School District;**
**CABOT PUBLIC SCHOOL DISTRICT; and**                                    **DEFENDANTS**
**CITY OF CABOT, ARKANSAS**

### <u>ORDER</u>

This case springs from Cabot School District's decision to place significant restrictions on Plaintiff Melissa Bosch's entry onto School District property.[1]  But the instant Order does not address the merits of this case.  Rather, the instant Order addresses a collateral issue:  Defendants' Motion for a Protective Order.[2]  Moreover, the instant Order addresses only a portion of that Motion because the Court has already denied much of the Motion.[3]

What's left to decide of this Motion is important—both to the litigants before the Court in this case and to Arkansans more broadly.  Does this Court have the authority to prohibit disclosure under Arkansas's Freedom of Information Act (FOIA) of documents (<u>or</u> parts of documents) that

---

[1] *See* Ex. 1 (June 14, 2022 Letter from Dr. Tony Thurman to Melissa Bosch) to Defs.' Mot. to Dismiss (Doc. 5-1) at 1 ("Effective immediately, you are not permitted on Cabot School District property except to attend to the affairs of your children.  You will be able to drop off and pick up your children from school.  You will be able to attend your children's parent/teacher conferences, open house, IEP meetings, 504 meetings, and/or disciplinary meetings after you have scheduled those appointments with building administration at least twenty-four (24) hours in advance.  Should it be necessary for you to enter onto Cabot School District property for any other reason, please contact myself or Michael Byrd, Deputy Superintendent, at least twenty-four (24) hours in advance of the event and/or meeting.  Failure to follow the directives of this letter will constitute trespassing, and we will request the assistance of local police for enforcement and legal action.").

[2] Doc. 22.

[3] *See* Order (Doc. 34) ("Except with respect to documents (<u>or</u> parts of documents) that Defendants claim (1) are attorney-client privileged <u>or</u> constitute attorney work product, (2) were created after the filing of the initial Complaint in this litigation, <u>and</u> (3) relate directly to the events described in, <u>or</u> claims made in, this litigation, Defendants' Motion for a Protective Order is denied.") (emphases in original).

(1) are attorney-client privileged <u>or</u> constitute attorney work product, (2) were created after the filing of the initial Complaint in this litigation, <u>and</u> (3) relate directly to the events described in, <u>or</u> claims made in, this litigation?  If the Court does have that authority, what is the scope of that authority, and should the Court exercise that authority here?

Although there is no binding precedent on point, the Court is not writing on a completely clean slate.  Most notably, in 2014, in a case titled *Fatemi v. White*, a learned judge in this District—Judge D. Price Marshall Jr.—faced a nearly identical question.[4]  The heart of Judge Marshall's decision follows:

> The Court . . . recognizes the Arkansas Supreme Court's decisions in *Scott v. Smith* and *City of Fayetteville v. Edmark*.  They hold that the Arkansas FOIA trumps any attorney-client privilege or work-product protection rooted in Arkansas law.  This federal Court, though, is not bound by this Arkansas precedent in applying the Federal Rules of Evidence or in interpreting the federal common law of privilege and work product.
>
> The many benefits to the fair and efficient administration of justice from the attorney-client privilege and the work-product protection are familiar.  These doctrines are part of the furniture of our adversary system.  Suffice it to say that, once litigation begins, a lawyer cannot represent [his] client as effectively and zealously as [he] otherwise could if all written communications with [his] client, as well as all [his] research, strategy, and notes, are open to interested citizens . . . and thus, inevitably, to opposing parties in the case . . . .
>
> \*\*\*
>
> Balancing all material considerations, the Court grants the . . . Defendants' request for a protective order.  The federal common law of privilege and work product shields the listed *post-suit* materials from disclosure under the Arkansas Freedom of Information Act until this litigation ends.  The client/lawyer communications are protected by the core privilege.  The lawyers' work—as embodied in the deposition-related materials, the drafts of papers to be filed with the Court, the legal research, the notes, and the memoranda about interviews, meetings, and timelines—is an amalgam of ordinary and opinion work product.  All these materials were, because of this pending case, made confidential by federal law when they were created.  The Supremacy Clause resolves the conflict between this

---

[4] No. 4:11-CV-458-DPM, 2014 WL 12754937, at *1 (E.D. Ark. Mar. 27, 2014).

> federal law and the Arkansas FOIA, which would otherwise make these materials public records. Disclosure would seriously injure the . . . Defendants by unveiling their defense, including counsels' assessment of the strengths and weaknesses, both legal and factual, on both sides of the case.
>
> The Court does not hold that the lawyers' work or client communications pre-suit are protected. That would cut too deeply into Arkansas law . . . . The Court likewise does not hold that the federal privilege/work-product protections that attached at suit will extend forever. They should—and will—end when this case, and any related litigation, ends. The whole point of these protections is, in furtherance of the administration of justice, for the . . . Defendants' lawyers to well discharge their obligations to their clients and this Court. Once the litigation concludes, the balance will tilt hard in favor of a completely open file. The reason for the rule of law having ceased, the law itself must cease.[5]

This Court agrees with a fair bit of *Fatemi*.[6]

First, during the pendency of a federal case, federal courts do have inherent authority to prevent a party (and that party's counsel) from seeing certain privileged documents belonging to the other party (or the other party's counsel).[7] As *Fatemi* implies, this is necessary to maintain the fairness, integrity, and fundamental nature of an adversarial judicial process. Second, when an exercise of the inherent authority just described would override the normal operation of a state FOIA law, the use of this power (1) must be limited to documents created after the federal lawsuit was initiated, and (2) must give way to the state FOIA law when the litigation ends.[8]

Notwithstanding the foregoing, the Court parts ways with *Fatemi* in certain important aspects.[9] The remainder of this Order will explain the Court's divergence in reasoning from *Fatemi* and the practical consequences of that divergence. But the bottom line is this: (1) the Court will not prevent anyone other than Plaintiff and her counsel from seeking or obtaining the

---

[5] *Id*. at *2–3 (internal citations omitted) (emphasis in original).

[6] *See id*.

[7] *See id*. at *2 (citing *Hollins v. Powell*, 773 F.2d 191,196 (8th Cir. 1985)).

[8] *See id*. at *3.

[9] *See generally id*.

disputed documents under Arkansas's FOIA law; but (2) the Court will temporarily prevent Plaintiff and her counsel from seeking (under Arkansas's FOIA law), being given, or otherwise seeing only a small portion of the disputed documents.

## I.  The Court's Authority to Issue Such an Order

*Fatemi* seems to view the federal common law of attorney-client privilege and attorney work product as existing in the ether—as a thing independent of the Federal Rules of Civil Procedure and the Federal Rules of Evidence.[10]  Under that view, the federal common law itself (combined with the Supremacy Clause of the United States Constitution) would be the source of a federal court's authority to prohibit disclosure of documents under a state FOIA law.  But this Court is not sold on the "brooding omnipresence" of the attorney-client privilege and attorney work product as ethereal creatures of common law that bestow any authority on a judge.[11]  Put another way, the federal common law is comprised of rules of decision, but it does not on its own authorize a federal judge to do anything.[12]  Such authority—at least with respect to attorney-client privilege and attorney-work-product protection—is most traditionally found in Federal Rule of Evidence 501, Federal Rule of Evidence 502, Federal Rule of Civil Procedure 26(b), and Federal Rule of Civil Procedure 26(c).  But those rules are about protecting information from the discovery process and from disclosure at trial; they do not appear to be more general grants of judicial authority to keep documents secret in other forums.[13]

---

[10] *See id.* at *2.

[11] *Cf. S. Pac. Co. v. Jensen*, 244 U.S. 205, 222 (1917) (Holmes, J., dissenting).

[12] *See In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 918 (8th Cir. 1997) ("Federal common law recognizes a privilege only in rare situations.").

[13] *See* Fed. R. Evid. 501; Fed. R. Evid 502; Fed. R. Civ. P. 26(b), (c).  *Cf. Scott v. Smith*, 292 Ark. 174, 176, 728 S.W.2d 515, 515–16 (1987) ("Neither [Arkansas] Rule [of Evidence] 502 nor ARCP Rule 26(b)(3) specifically provides that it should have application outside of these limited areas, and we have previously held that a statute dealing with admission of evidence and discovery should not create a specific exception to the [Arkansas] Freedom of Information Act.").

Nonetheless, there is a source of authority that supports at least a portion of the outcome in *Fatemi*. That source of authority—often described as the inherent authority of the Court to control the litigation process over which it presides—has been repeatedly recognized by both the Supreme Court of the United States and the Eighth Circuit.[14] The best understanding of the precedent is that this power stems from—and is thus bounded by—Article III, Section 1 of the United States Constitution. That section "vest[s]" the "judicial Power of the United States . . . in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."[15] And as the Supreme Court has long said, "[c]ourts *invested with the judicial power of the United States* have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities."[16]

Although the concept of inherent authority is "[d]eeply rooted in Anglo-American judicial usage," courts have often failed to grapple with this deep history when defining inherent authority—resulting in a "broad" concept that is "nowhere precisely defined."[17] Some jurists and scholars see this as a virtue because it "leave[s] a trial court with wide procedural leeway to conduct its civil business in the interest of the sound and efficient administration of justice."[18] This Court, however, sees it as a vice—or, more accurately, a potential vice. Without a limiting principle, such an amorphous and malleable "inherent authority" to act in the absence of written

---

[14] *See, e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991); *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 749 (8th Cir. 2018).

[15] U.S. Const. art. III, § 1. *See also* U.S. Const. art. III, § 2, cl. 1 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made . . . under their Authority . . . .").

[16] *Degen v. United States*, 517 U.S. 820, 823 (1996) (emphasis added).

[17] Daniel J. Meador, *Inherent Judicial Authority in the Conduct of Civil Litigation*, 73 Tex. L. Rev. 1805, 1805 (1995).

[18] *Id.*

law imbues unelected and unaccountable judges with powers more appropriate for a legislature or a chief executive.

While the caselaw does not supply a serious limiting principle, the caselaw does not foreclose this Court from adopting one as a matter of discretion.  And this Court believes the most appropriate limitation arises from an understanding of a court's inherent authority as nothing more than those powers that are obviously and undoubtedly included in the "judicial [p]ower" granted to federal courts by the Constitution.[19]  Put another way, inherent authority allows nothing more than the exercise of powers that are necessary for a court to be a court.

This somewhat narrow conception of inherent authority is consistent with what appears to be the first (or at least a very early) acknowledgement by the Supreme Court of Article III courts' inherent judicial authority:  an 1812 decision from the Marshall Court in *United States v. Hudson*.[20] In *Hudson,* that Court explained that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution."[21]  For example, the Court noted—in the context of the powers to fine for contempt and imprison for contumacy—that these "are powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others: and so far our Courts no doubt possess powers not immediately derived from statute . . . ."[22]  The Marshall Court's distillation of inherent judicial authority did not just come out of thin air.  Rather, it tracked the English courts' understanding that they could manage internal business, regulate

---

[19] U.S. Const. art. III, § 1.

[20] 11 U.S. (7 Cranch) 32 (1812) (Johnson, J., writing for a unanimous court).

[21] *Id*. at 34.

[22] *Id*.

proceedings, and punish certain types of contempt absent Parliament's blessing to do so—simply because such powers were "incident of their status as courts."[23]

There has been a lively academic debate as to whether inherent authority should (1) be limited to only those powers *necessary* for a court to be a court, (2) encompass any power that is *helpful* for a court to do its work, or (3) be subject to some standard in between these two extremes.[24]   And the courts have been less than clear on the question.   The Supreme Court has,

---

[23] Robert J. Pushaw, Jr., *The Inherent Powers of Federal Courts and the Structural Constitution*, 86 Iowa L. Rev. 735, 812–14 (2001) (internal quotation marks omitted).

[24] For example, with respect to the *Hudson* case, then-Professor Amy Coney Barrett suggested that the necessity limitation was context-specific and did not stand as a universal limitation on the reach of inherent authority:

> That, however, is an overreading of these cases, all of which have arisen in the context of the courts' inherent power to punish contempt and otherwise impose sanctions.   Understood in context, the "necessity" limit is designed to preserve a limited core of judicial authority from falling within the general prohibition on adjudicating common law crimes, while at the same time preventing a court's power to punish misbehavior from infringing too far on Congress's exclusive power to define federal criminal jurisdiction.   In other words, the "necessity" limit provides a very limited exception to the rule that only Congress can criminalize conduct.   While the Court has never expressly confined the "necessity" limit to cases involving inherent judicial authority to punish misbehavior, it has applied the limit in only that context.   Of particular relevance for present purposes, it has never mentioned, much less applied, the limit in the context of inherent procedural authority, and the procedures it has approved as falling within that authority go far beyond what is strictly necessary to the decision of cases.   To the extent that federal courts possess inherent procedural authority, no necessity limit applies to it.

Amy Coney Barrett, *Procedural Common Law*, 94 Va. L. Rev. 813, 880–82 (2008) (internal citations omitted).   Taking a different tack, Robert Pushaw, who described the overall debate fairly well, suggested treating inherent authority as falling into three separate buckets:

> Article III's language vesting "judicial power" in autonomous "courts" to decide specified "Cases" and "Controversies" presupposes a core of authority that stems from the very nature of the judicial office in Anglo-American history.   This pure "judicial power" consists of applying pre-existing law to the facts in a particular case, then rendering a final, binding judgment.   Separation of powers dictates that neither Congress nor the President can interfere with this power; otherwise, the federal courts' independence and essential constitutional functions would be destroyed.   The Constitution's provisions authorizing Congress to regulate the judiciary have never been viewed as relevant to the actual process of adjudication.

> ***

> Article III's grant of express authority to federal judges implies that they must have ancillary powers that are absolutely essential to exercise their enumerated ones.   This category, which the Court has called "inherent authority," can more accurately be described as "implied indispensable powers."   This relabeling is not merely a semantic quibble.   Federal judges have grandly invoked "inherent powers" to justify the assertion of several remarkably broad prerogatives.   The use of the term "implied indispensable powers" would clarify that courts can infer a power only if they would otherwise be unable to perform their express constitutional functions competently.

over the years, recognized a robust version of inherent authority, ranging from the power to dismiss a case for failure to prosecute, to the power to punish court participants for contempt, to the power to recall a jury after it has been discharged.[25]   But, at the same time, that Court has also been understandably cautious about over-extending inherent authority.[26]   It has frequently noted that "[t]he inherent powers of federal courts are those which 'are necessary to the exercise of all others.'"[27]   And it has warned that, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion."[28]   In short, "[t]he extent of these powers must be delimited

---

Such strict necessity arises in two situations.  One involves the core "judicial power" of deciding cases.  Most importantly, adjudication requires impartial, relevant, and consistent fact-finding.  As the factual record develops largely through the application of the law of procedure and evidence, federal courts must have power to fill in any gaps in that law.  Furthermore, judges must be able to compel witnesses to testify, manage discovery, and take any other steps necessary to ensure a complete and accurate record.  Finally, because issuance of a judgment is a crucial component of judicial power, courts must have discretion to enter, correct, and modify their judgments and to decide when to issue their mandates.

The other type of implied indispensable power stems from Article III's creation of "courts," which necessarily can maintain their authority, regulate their internal administrative affairs, and supervise the judicial process.

\*\*\*

"Beneficial" inherent powers are helpful, useful, or convenient in implementing Article III.  Federal judges should not assert such powers unilaterally because the Constitution limits implied authority to cases of genuine necessity.  Moreover, the Necessary and Proper Clause entrusts Congress with all policy determinations concerning the existence and extent of beneficial powers, as the Court recognized for many years.

Over the past century, however, federal judges have exercised an increasing array of beneficial powers, either by loosely characterizing them as "necessary" or by claiming discretion to take any actions that will help them operate effectively.

Pushaw, *supra* note 23 at 844, 847–49 (internal citations omitted).

[25] *See, e.g., Dietz v. Bouldin*, 579 U.S. 40, 48 (2016) (holding that "a federal district court can rescind a discharge order and recall a jury in a civil case as an exercise of its inherent powers"); *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962) ("The authority of a court to dismiss sua sponte for lack of prosecution has generally been considered an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."); *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (explaining that, because "[c]ourts independently must be vested with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates, and . . . to preserve themselves and their officers from the approach and insults of pollution . . . [they have] embraced an inherent contempt authority as a power necessary to the exercise of all others") (internal quotation marks and citations omitted).

[26] *See, e.g., Degen*, 517 U.S. at 823.

[27] *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980) (quoting *Hudson*, 11 U.S. (7 Cranch) at 34).

[28] *Chambers*, 501 U.S. at 44.

with care, for there is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority."[29] "Principles of deference counsel restraint in resorting to inherent power, and require its use to be a reasonable response to the problems and needs that provoke it."[30]

So what does all this tell us?  Two things.  First, when considering whether a court's inherent authority should be extended to a novel exercise of power, it is terribly important to remember that the real question is whether the act being contemplated falls within "the judicial [p]ower of the United States . . . ."[31]  Here, the Defendants are asking the Court to universally prohibit Arkansans from obtaining, by way of Arkansas's FOIA law, documents in Defendants' control.[32]  Nearly all the people who would be affected by such an order are non-parties to this case.  And they are not in any way associated with the Court.  The documents Defendants seek to protect from FOIA disclosure are Defendants' own documents.[33]  They are not court documents (such as transcripts).  And they are not documents that have been given to Defendants by others in the discovery process.

Under such circumstances, issuing an order to prevent the normal operation of Arkansas's FOIA law with respect to persons not before the Court strikes the Court as far more of an exercise of legislative or executive power than an exercise of judicial power.  Even if the broad concept of inherent authority in vogue these days would allow the Court to exercise such power, in this

---

[29] *Degen*, 517 U.S. at 823.

[30] *Id*. at 823–24 (internal citations omitted).

[31] U.S. Const. art. III, § 1.

[32] *See* Defs.' Mot. for Protective Order (Doc. 22) ¶¶ 1, 4.

[33] *See* Ex. 1 (First FOIA Request) to Defs.' Mot. for Protective Order (Doc. 22-1) at 1; Ex. 2 (Second FOIA Request) to Defs.' Mot. for Protective Order (Doc. 22-2) at 1; Ex. 5 (Third FOIA Request) to Defs.' Mot. for Protective Order (Doc. 22-5) at 1.

situation discretion is the better part of valor.  And, in the Court's view, the best exercise of the

Court's discretion is to refrain from an act that arguably goes beyond "the judicial power of the

United States."

Second, with respect to the persons before the Court in this case (the parties and their

counsel), the exercise of the Court's inherent authority must be carefully cabined.  A federal court

is operating at the absolute nadir of its power when it relies on its inherent authority.  That is

because we are operating in a zone of implied powers, not express ones.  Much of the content of

inherent authority has sprung from nothing more concrete than judges' estimations of what implied

powers would be helpful for judges to do their jobs.[34]  When a federal court is acting in a way that

is not specifically authorized by statute or rule, but rather is acting only in reliance on the

amorphous concept of inherent authority, that federal court must proceed with the utmost of

caution.[35]

This goes doubly when neither the Supreme Court of the United States nor any circuit court

has approved such a specific act as a valid exercise of inherent authority.  And it goes triply when

the action being contemplated by the federal court is going to displace (even temporarily and even

for a small number of persons) the normal functioning of a state law.[36]  It's one thing for a federal

law—adopted by the People's elected representatives—to displace state law.  It's quite another

thing for an unelected federal judge's incantation of "inherent authority" to be used for the same

---

[34] *See* Barrett, *supra* note 24 at 819–20 (explaining that "five doctrines representative of procedural common law[,] abstention, forum non conveniens, stare decisis, remittitur, and preclusion[,]" are "'procedural' insofar as [they are] concerned with regulating court processes, and each is 'common law' insofar as it is judge-made rather than the product of textual interpretation").

[35] *See Degen*, 517 U.S. at 823–24.

[36] It is true, of course, that Arkansas Code Annotated section 25-19-105(b)(8) provides that "[d]ocuments that are protected from disclosure by order or rule of court" are not subject to disclosure under Arkansas's FOIA law.  So, an Order from this court would not technically be overriding the state law.  However, if the Court has the power to issue this type of Order, it could do so regardless of whether the state statute had such an exception.  And, under the Supremacy Clause, the Court's Order would override such a state statute.

purpose.   While there are instances where the use of this authority is necessary (and thus appropriate), our system of dual-sovereignty federalism—a system that creates the strong backbone of our constitutional order—should make federal courts extremely hesitant to deploy this power.   Even assuming that inherent authority theoretically covers the contemplated action, federal courts should decline to use the power in a way that would override state law unless the contemplated action is absolutely essential to protecting a non-negotiable feature of the federal judicial process.

## II.    Attorney Work Product

The foregoing views of the Court's inherent authority, and the important limitations on it, have real meaning in this case.   Consider, for example, Defendants' request that this Court prevent the disclosure of documents that constitute attorney work product to Plaintiff (by way of Arkansas's FOIA law).[37]   As a general matter, it appears that *Fatemi* agreed that such documents (assuming they were created after the federal lawsuit was initiated) should be protected from disclosure under Arkansas's FOIA law until the end of the litigation.[38]   But this Court concludes that not all attorney-work-product documents should be protected from such disclosure.   Here's why.

Attorney work product is best defined as "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."[39]   That can cover a broad category of documents.   But the federal discovery protections for attorney work product are not

---

[37] *See* Defs.' Mot. for Protective Order (Doc. 22) ¶¶ 1, 4.

[38] *See Fatemi*, 2014 WL 12754937, at *3.

[39] Fed. R. Civ. P. 26(b)(3)(A).

absolute.[40]  In discovery, a party can be required to turn over attorney work product if (1) it is otherwise discoverable, (2) the opposing party shows a substantial need for it, and (3) the opposing party can't otherwise obtain its substantial equivalent without undue hardship.[41]  There is, however, a narrower category of attorney work product that is always protected by the federal discovery rules:  (1) "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation[,]" (2) "drafts of any [expert] report or disclosure[,]" and (3) "communications between" the attorney and expert, except as specified in Federal Rule of Civil Procedure 26(b)(4)(C)(i)–(iii).[42]

The federal discovery rules are not directly applicable here.  That is because Defendants are asking the Court to prevent disclosure under Arkansas's FOIA law as opposed to just preventing disclosure in the federal discovery process.[43]  Nonetheless, despite the federal discovery rules not having direct applicability, they tell the Court something important.  The rules strongly suggest that not every disclosure of attorney work product would fatally undermine non-negotiable features of the federal judicial process.[44]  Otherwise, why would the rules ever allow disclosure of such documents?  At the same time, the rules strongly suggest the existence of a narrower category of attorney-work-product documents that, if disclosed to an adversary, would fatally undermine non-negotiable features of the federal judicial process.[45]  Those core attorney-work-product documents—the documents that fall within any one of the three categories

---

[40] *See* Fed. R. Civ. P. 26(b)(3)(A)(i)–(ii).

[41] *See id.*

[42] Fed. R. Civ. P. 26(b)(3)(B), (b)(4)(B), (b)(4)(C).

[43] *See* Defs.' Mot. for Protective Order (Doc. 22) ¶ 4.

[44] *See* Fed. R. Civ. P. 26(b)(3)(A)(i)–(ii).

[45] *See* Fed. R. Civ. P. 26(b)(3)(B), (b)(4)(B), (b)(4)(C).

identified in the last sentence of the preceding paragraph—therefore enjoy absolute protection in the federal discovery process.[46]

Given the reticence with which a federal court should consider using inherent authority to override state law, the Court finds it appropriate to temporarily prevent disclosure (by way of Arkansas's FOIA law) to Plaintiff and her counsel of the documents (or parts of documents) that fall within any one of the three categories of attorney work product that merit absolute protection under the federal discovery rules.[47]  The Court will not extend this protection to reach the broader category of all attorney-work-product documents.  When the entire document falls within any one of the three core categories, the document does not need to be disclosed to Plaintiff or her counsel under Arkansas's FOIA law until this litigation ends.  When part or parts of the document (but not the entire document) fall within any one of the three core categories, the portions meriting protection under the foregoing analysis should be redacted in any disclosure made to Plaintiff or her counsel before the end of this litigation.[48]

The Court understands, of course, that, given its ruling in Section I *supra*, there may be documents (or parts of documents) that Defendants do not have to disclose (by way of Arkansas's FOIA law) to Plaintiff and her counsel, but must disclose to other persons not before the Court.  If such persons were to provide those documents to Plaintiff or her counsel, the effectiveness of the Court's order would be completely undermined.  However, the Court has a fix for that potential problem that makes it unnecessary (and thus unadvisable) to expand the Order to apply to all Arkansans.

---

[46] *See id*.

[47] *See* Fed. R. Civ. P. 26(b)(3)(A)(i)–(ii).

[48] It should go without saying—but the Court will say it anyway—that the documents protected from disclosure must relate to the events or legal claims in this case.  And the documents must have been created after the lawsuit was filed.

As to the documents (or parts of documents) that the Court is protecting from disclosure to Plaintiff and her counsel, the Court orders that, for the pendency of this litigation, Plaintiff and her counsel:  (1) may not request, suggest, or advise anyone to obtain these documents by way of Arkansas's FOIA law; (2) may not help, participate in, or otherwise be involved in obtaining these documents by way of Arkansas's FOIA law; (3) may not solicit or accept these documents from anyone; (4) may not request, suggest, advise, or help anyone regarding distribution of such documents; and (5) may not view, read, or listen to these documents, or any partial or complete summaries of these documents.  Lack of intent will not be a defense to a violation of this Order. If a violation of this Order occurs, the violator must self-report the violation.  There will be significant penalties for non-compliance.

### III.    Attorney-Client Privilege

Next up for consideration is Defendants' request that the Court protect from disclosure under Arkansas's FOIA law all attorney-client-privileged documents.[49]  *Fatemi* agreed such documents (assuming they were created after initiation of the federal litigation) should be protected from disclosure until the end of the case.[50]  Unlike attorney work product, the federal discovery rules afford complete protection to attorney-client-privileged documents.[51] So this Court generally accepts *Fatemi*'s logic that the protections afforded by this privilege are a non-negotiable feature of the federal judicial process.[52]  Here, the Court's divergence from *Fatemi* has to do with a

---

[49] *See* Defs.' Mot. for Protective Order (Doc. 22) ¶¶ 1, 4.

[50] *See Fatemi*, 2014 WL 12754937, at *3.

[51] "Complete protection" is a bit of an overstatement.  There are minor exceptions from the protections generally afforded by attorney-client privilege.  *See, e.g.*, *In re BankAmerica Corp. Sec. Litig.*, 270 F.3d 639, 641 (8th Cir. 2001) (quoting *United States v. Zolin*, 491 U.S. 554, 563 (1989)) (explaining "that the attorney-client privilege 'does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime'").  But those limited exceptions prove the general rule.

[52] *See Fatemi*, 2014 WL 12754937, at *2.

predicate question of attorney-client privilege—a question that, for whatever reason, *Fatemi* appears not to have had to address.[53]  That question is:  what impact does Arkansas's FOIA law have on whether a document is attorney-client privileged under federal common law in the first place?

The question is important because, if a document is not attorney-client privileged under federal common law, then a federal court certainly should not use its inherent authority to protect that document from disclosure under a state FOIA law.  And the question is complicated because it presents a sort of chicken-and-egg quandary:  do you first determine whether a document is attorney-client privileged in the abstract and only then consider what that means for disclosure under Arkansas's FOIA law; or do you consider whether the existence of the Arkansas FOIA law means that a document that might be attorney-client privileged in some other state isn't actually attorney-client privileged in Arkansas?  Let's unpack that a little bit more.

The Eighth Circuit has made clear that an expectation of confidentiality is the *sine qua non* of attorney-client privilege:

> The common law rule of attorney-client privilege extends only to *confidential* communications from a client to his or her attorney.  Confidential communications encompass that information communicated on the understanding that it would not be revealed to others . . . .  Moreover, matters existing in the public eye, such as a person's appearance and handwriting, are generally not confidential communications because they were not exposed on the assumption that others would not learn of them.[54]

Reinforcing this principle, the Eighth Circuit has recently reiterated that "the attorney-client privilege is narrowly construed and 'protects only those disclosures—necessary to obtain informed

---

[53] *See id*. at *1–3.

[54] *In re Grand Jury Proc. (85 Misc. 140)*, 791 F.2d 663, 665 (8th Cir. 1986) (internal citations omitted) (emphasis in original).

legal advice—which might not have been made absent the privilege.'"[55]   Under this precedent, it is quite likely that a good chunk of what Defendants claim to be attorney-client-privileged documents are, in fact, not attorney-client privileged at all.

*First*, let's consider (1) anything written by Dr. Thurman or other School District personnel and provided to counsel, (2) any other document provided by Dr. Thurman or other School District employees to counsel, (3) anything written by counsel and provided to Dr. Thurman or other School District personnel, and (4) any other document provided by counsel to Dr. Thurman or other School District personnel.[56]   Such documents could not have been provided to the recipient with an expectation of confidentiality.   Remember, these are Arkansas public officials giving written documents to Arkansas counsel (or vice versa) about "the performance or lack of performance of official functions that are or should be carried out by a public official . . . ."[57]   It is black-letter law that such written documents would be subject to public dissemination under Arkansas's FOIA law—absent a separate exception applying.[58]   Given this black-letter law, it would be entirely unreasonable for any client to believe that any type of writing he provided to (or got from) counsel would remain confidential if it did not meet some separate exception under Arkansas's FOIA law.[59]   It follows, then, that any such document would not be attorney-client privileged.

---

[55] *United States v. Ivers*, 967 F.3d 709, 716 (8th Cir. 2020) (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

[56] *See* Ex. 1 (First FOIA Request) to Defs.' Mot. for Protective Order (Doc. 22-1) at 1; Ex. 2 (Second FOIA Request) to Defs.' Mot. for Protective Order (Doc. 22-2) at 1; Ex. 5 (Third FOIA Request) to Defs.' Mot. for Protective Order (Doc. 22-5) at 1.

[57] Ark. Code Ann. § 25-19-103(7)(A).

[58] *See, e.g.*, *City of Fayetteville v. Edmark*, 304 Ark. 179, 192, 801 S.W.2d 275, 282 (1990) ("[T]here is no attorney-client privilege or attorney work product exemption under the [Arkansas] FOIA[,] . . . [and] [t]he FOIA has not been amended to include exemptions for attorney-client privilege or for attorney work product."). *See also* Ark. Code Ann. § 25-19-105(b) (providing an exhaustive list of documents not subject to disclosure under Arkansas's FOIA law).

[59] *See id.*

*Second*, let's consider information communicated orally from a client to counsel (or vice versa) and then written down.  If the communicator did not realize the information was going to be written down, then such information likely has the necessary expectation of confidentiality to be considered attorney-client privileged.[60]   However, if the communicator knew that the orally-provided information was going to be written down or otherwise recorded—for example, an attorney took notes as a client recounted certain events and the note-taking was obvious to or otherwise known to the client—then the information does not have the necessary expectation of confidentiality to be considered attorney-client privileged.[61]  That's because the information was relayed with the knowledge that it would be written down (or otherwise recorded) and thus subject to public dissemination under Arkansas's FOIA law (absent some independent FOIA-based exception).[62]

It does not appear that the Eighth Circuit or the Supreme Court of Arkansas have spoken to this precise question:  whether the unique breadth of Arkansas's FOIA law eviscerates much of the traditional scope of attorney-client privilege beyond the FOIA context.[63]  But it is logically

---

[60] *See* Ark. Code Ann. § 25-19-103(7)(A) ("'Public records' means writings, recorded sounds, films, tapes, electronic or computer-based information, or data compilations in any medium required by law to be kept or otherwise kept and that constitute a record of the performance or lack of performance of official functions that are or should be carried out by a public official or employee, a governmental agency, or any other agency or improvement district that is wholly or partially supported by public funds or expending public funds.  All records maintained in public offices or by public employees within the scope of their employment shall be presumed to be public records.").  Because unrecorded oral communications are not "writings, recorded sounds, films, tapes, electronic or computer-based information, or data compilations in any medium[,]" unrecorded oral communications are not public records within the meaning of Arkansas's FOIA law.  *See id.*

[61] *See id.*

[62] *See id.*

[63] For example, neither the Arkansas Court of Appeals nor the Supreme Court of Arkansas has ever considered whether a litigant can obtain what is traditionally thought of as attorney-client-privileged documents from a public official (who is the opposing party) in discovery.  Maybe this is because Arkansas's FOIA law provides a more advantageous method to obtain the same material, so no one uses discovery for this purpose.  *See* Ark. Code Ann. § 25-19-105(a) (requiring FOIA-covered documents to be produced within three days of the request).  Or maybe it's because public attorneys (or private attorneys doing work for public officials or entities) realize that their communications are not confidential and are therefore not covered by attorney-client privilege.  As a result, maybe attorneys haven't tried to raise this defense to discovery in state court—or maybe they just don't write client communications down.  Another

impossible to see how one could arrive at a different conclusion.  If only information conveyed with an expectation of confidentiality is protected by attorney-client privilege, and if Arkansas's FOIA law means that nearly all information conveyed between public entities or officials and their counsel is not communicated with an expectation of confidentiality, then nearly all such information is not attorney-client privileged.

Given the foregoing, the Court will temporarily protect from disclosure to Plaintiff and her counsel (by way of Arkansas's FOIA law) only documents (or parts of documents) that reflect oral communications between the attorney and client made after the initiation of the federal lawsuit and made without the communicator realizing that the receiving party would write down or otherwise record the content of the communication.  Plaintiff and her counsel may use Arkansas's FOIA law for anything else (assuming that other thing doesn't come under the core attorney-work-product protection the Court has addressed in Section II *supra* or any independent Arkansas FOIA exception).

Finally, for the same reasons discussed above, the Court orders that, with respect to the documents that Plaintiff and her counsel may not obtain by way of Arkansas's FOIA law, for the pendency of this litigation, the Plaintiff and her counsel:  (1) may not request, suggest, or advise anyone to obtain these documents by way of Arkansas's FOIA law; (2) may not help, participate in, or otherwise be involved in obtaining these documents by way of Arkansas's FOIA law; (3) may not solicit or accept these documents from anyone; (4) may not request, suggest, advise, or help anyone regarding distribution of such documents; and (5) may not view, read, or listen to

---

reason could be that discovery-related orders are rarely appealable on an interlocutory basis, and the Arkansas courts may have simply not had the chance to consider the issue.  *See* Ark. R. App. P.–Civ. 2(f) (detailing when an interlocutory appeal may be taken from a discovery-related order).  Whatever the reason, there really is no "Arkansas approach" for the Court to adopt.

these documents, or any partial or complete summaries of these documents.  Lack of intent will not be a defense to a violation of this Order.  If a violation of this Order occurs, the violator must self-report the violation.  There will be significant penalties for non-compliance.

## CONCLUSION

For the reasons discussed above, and in the ways discussed above, the Court GRANTS IN PART and DENIES IN PART the portion of the Motion for Protective Order that previously had been held in abeyance.  To the extent this Court's September 14, 2023 Order protected more documents from FOIA disclosure than this instant Order does, this Order controls and supersedes the September 14, 2023 Order.[64]  The Court intends for this Order to constitute a court order protecting documents from disclosure to Plaintiff and her counsel as set forth in Arkansas Code Annotated section 25-19-105(b)(8).  The Court further intends that, to the extent there is any FOIA dispute as to how the Order applies to a specific document or part of a specific document, that dispute will be resolved either by the mutual consent of those involved in the FOIA request or by the state court hearing a state-FOIA lawsuit brought to require the disclosure of a particular document or part of a document.  Finally, for the purposes of this Order, the word "documents" is intended to have the broadest meaning possible, including e-mails, letters, videos, recordings, and any other thing that could possibly be responsive to a FOIA request.

To sum it up:  (1) aside from the Plaintiff and her counsel, the Court's Order does not prohibit anyone from obtaining all documents disclosable under Arkansas's FOIA law; (2) with respect to Plaintiff and her counsel, the Court's Order prevents FOIA disclosure to them of only core attorney work product (identified *supra* on Pages 12–13) and a very narrow slice of what is traditionally thought of as attorney-client-privileged information (identified *supra* on Page 18);

---

[64] *See* Order (Doc. 34).

and (3) with respect to the information the Court protects from FOIA disclosure to Plaintiff and her counsel, the Court orders that Plaintiff and her counsel may not intentionally or accidentally obtain that information from any other person or entity.

Even though Plaintiff has received much of what she wanted from this Order, the Court understands that the Order deprives her of some information under Arkansas's FOIA law.  In the Court's view, this small deprivation is necessary to maintain the fairness, integrity, and fundamental nature of an adversarial judicial process.  There is considerable risk that disclosure of such information (especially core attorney work product) to Plaintiff's side would so unbalance the scales of justice as to render the trial so unfair that it would not be a trial at all (at least as we know the term).  *Fatemi* is right about that.[65]  And an indispensable part of the judicial power is to avoid that outcome.[66]

---

[65] *See Fatemi*, 2014 WL 12754937, at *2–3.

[66] This is true even though neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence specifically authorize such an Order.  That is clear from *Chambers v. Nasco, Inc.*  In that case, the Supreme Court considered whether "28 U.S.C. § 1927 [or] Federal Rule of Civil Procedure 11 limits a court's inherent authority to sanction bad-faith conduct 'when the party's conduct is not within the reach of the rule or the statute.'"  *Chambers*, 501 U.S. at 42 (quoting *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir. 1990)).  In *Chambers,* the district court imposed serious financial sanctions on Mr. Chambers (the entirety of the other side's legal bill) for, among other things, (1) attempts "to deprive [the] Court of jurisdiction by acts of fraud, nearly all of which were performed outside the confines of [the] Court, (2) [the filing of] false and frivolous pleadings, and (3) attempt[s] by other tactics of delay, oppression, harassment and massive expense to reduce plaintiff to exhausted compliance."  *Id.* at 41 (internal quotation marks omitted).  The district court understood that 28 U.S.C. § 1927 did not apply to this sanction award against a party.  *See Chambers*, 501 U.S. at 41–42.  That's because that statute only covers sanctions against *attorneys* "who so multipl[y] the proceedings in any case unreasonably and vexatiously . . . ."  28 U.S.C. § 1927.  The district court also understood that Rule 11 did not reach all of Chambers's sanction-worthy conduct.  *See Chambers*, 501 U.S. at 41–42.  So, the district court instead relied on its inherent power to sanction parties.  *Id.* at 42.  The Supreme Court affirmed the sanctions.  *See id.* at 57–58.  It held that neither § 1927 nor Rule 11 "displaces the inherent power to impose sanctions for [Chambers's] bad-faith conduct . . . ."  *Id.* at 46.  Specifically, the Supreme Court noted that while "[i]t is true that the exercise of the inherent power of lower federal courts can be limited by statute and rule . . . we do not lightly assume that Congress intended to depart from established principles such as the scope of a court's inherent power."  *Id.* at 47 (internal quotation marks omitted).

The Order issued today essentially addresses a gap left by the federal rules in the unique context of an extraordinarily broad state FOIA law.  The Court has the power to do that.  *See* Samuel P. Jordan, *Situating Inherent Power Within A Rules Regime*, 87 Denv. U. L. Rev. 311, 314 (2010) ("The invocation of inherent power as a gap-filler has persisted even after the conformity regime was displaced by the federal rules.  Courts properly understand the rules not as an attempt to describe the universe of permissible procedures, but instead as an effort to formalize and unify the procedures that are to be applied in specific situations.  Thus, procedural gaps are still inevitable, and courts continue to rely on inherent power to create case-specific procedures to fill those gaps.").  Congress has essentially ratified a

IT IS SO ORDERED this 25th day of October 2023.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

court's power to protect disclosure of certain documents by setting forth rules for sealing litigation-related materials and for issuing protective orders. *See generally* Fed. R. Civ. P. 5.2(d); Fed. R. Civ. P. 26(b), (c). And just as the Court's inherent authority to sanction parties is not completely constrained by complementary rules or statutes, the Court's power to limit the disclosure of certain litigation-related documents to the other side is not completely constrained by related but non-exclusive Federal Rules of Civil Procedure or Evidence. *See Chambers*, 501 U.S. at 47.